**BLUE CROSS & BLUE SHIELD UNITED OF WISCONSIN & SUBSIDIARIES, Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 98–727T.

United States Court of Federal Claims.

June 12, 2003.

Timothy G. Schally, Michael Best & Friedrich LLP, Milwaukee, Wisconsin, for the plaintiff. Robert A. Schnur, Kristina E. Somers, Michael Best & Friedrich LLP, Milwaukee, Wisconsin, of counsel.

Mary M. Abate, Tax Division; Mildred L. Seidman, Chief, Court of Federal Claims Section; and Eileen J. O'Connor, Assistant Attorney General, United States Department of Justice, for the defendant.

**OPINION**

HORN, Judge.

This tax case was brought by Blue Cross & Blue Shield United of Wisconsin (BCW), the common parent company of a group of affiliated taxable insurance and service corpora-

tions during the period at issue in this case.[1] The present cross-motions for partial summary judgment[2] concern the calculation of BCW's Internal Revenue Code (IRC) section 832(c)(4) losses incurred deduction for tax year 1987. *See* 26 U.S.C. § 832(c)(4) (1982 & Supp. V 1987) (hereinafter IRC § 832(c)(4)). As delineated in IRC § 832(b)(5), in order to calculate its IRC § 832(c)(4) losses incurred deduction, BCW must determine the amount of its "unpaid losses," or the "loss reserve." Loss reserves are defined as "estimates of amounts insurers will have to pay for losses that have been reported but not yet paid, for losses that have been incurred but not yet reported, and for administrative costs of resolving claims." *Atl. Mut. Ins. Co. v. Comm'r*, 523 U.S. 382, 384, 118 S.Ct. 1413, 140 L.Ed.2d 542 (1998). The issue in dispute is the method to be employed to determine the loss reserve for unpaid claims[3] as of December 31, 1986. The plaintiff, BCW, contends that it is required to compute "its opening 1987 loss reserve for unpaid claims"[4] using what is known as "actual claims paid" data for 1987; that is, "the actual amounts paid out during 1987 in satisfaction of [BCW's] unpaid claims as of January 1, 1987." The defendant, however, maintains that the loss reserve for unpaid claims as of December 31, 1986 should be computed using the actuarial estimate of BCW's unpaid loss reserve, as reported on the company's annual statement.[5]

The plaintiff makes two legal arguments. First, the plaintiff contends that the use of actual claims paid data to compute the loss reserve for unpaid claims is mandated by statute. Second, in the alternative, the plaintiff maintains that, even if the applicable statutes are "unclear or ambiguous," any such ambiguity was resolved by the "Closing Agreement on Final Determination Covering Specific Matters" (Closing Agreement) between the plaintiff and the IRS, which states that BCW's "January 1, 1987 loss reserve for incurred-but-not-paid claims" should be determined "in accordance with actual claims paid data for 1987."

In response, the defendant argues that BCW is required by statute to employ the actuarial estimate of its unpaid loss reserve as of December 31, 1986, as reported by BCW on its annual statement. The defendant also contends that the disputed provision in the Closing Agreement is not relevant to BCW's IRC § 832(c)(4) deduction for tax year 1987. Finally, the defendant argues that the IRS did not agree to any matter pertaining to BCW's IRC § 832(c)(4) deduction for tax year 1987 in the Closing Agreement.

## FINDINGS OF FACT

On May 15, 1986, the plaintiff filed Form 990, "Return of Organization Exempt from

1. The group of related corporations includes Blue Cross' wholly-owned subsidiary Compcare Health Services Insurance Corporation (CHSIC); Blue Cross's wholly-owned subsidiary United Wisconsin Services, Inc. (UWS); and UWS' wholly-owned subsidiaries United Wisconsin Life Insurance Company (UWLIC), United Wisconsin Insurance Company (UWIC), Leasing Unlimited, Inc. (LUI), and Proservices. Unless otherwise specified, all references to "BCW" are to the parent company, Blue Cross & Blue Shield United of Wisconsin, and not to any other Blue Cross and Blue Shield corporation, or subsidiary.

2. This opinion concerns the parties' cross-motions for partial summary judgment exclusively. In the overall suit, the plaintiff is seeking the recovery of federal income tax and interest that it claims were erroneously assessed and collected by the Internal Revenue Service (IRS) for the tax years ending December 31, 1987 and December 31, 1989, and the recovery of interest on such tax and interest. The plaintiff alleges that it is entitled to $874,921.17, plus interest, arising from

tax year 1987, and $25,618.00, plus interest, arising from tax year 1989.

3. The parties use the terms "loss reserve for unpaid claims," "unpaid loss reserve," and "loss reserve for incurred-but-not-paid claims" interchangeably.

4. The plaintiff generally employs the term, "opening 1987 loss reserve." The defendant generally uses the term, unpaid losses "outstanding at the end of December 31, 1986." The terms used by the parties, here, are synonymous in that the unpaid losses outstanding at the end of December 31, 1986 are equivalent to the 1987 opening loss reserve.

5. BCW is regulated by the Office of the Commissioner of Insurance (OCI) of Wisconsin. BCW is required to file an annual statement on a form published by the National Association of Insurance Commissioners (NAIC) with both the OCI and the NAIC. *See* IRC § 846(f)(3).

Federal Income Tax," with the IRS for the year ending December 31, 1985 (tax year 1985). On this return, the plaintiff stated that it was filing as an organization exempt from federal income tax pursuant to IRC § 501(c)(4).

On September 15, 1987, the plaintiff filed with the IRS two "U.S. Corporation Income Tax Returns" (Forms 1120), one for its tax year 1985 and a consolidated tax return [6] for its tax year 1986. The Form 1120 for tax year 1985 was intended to replace the Form 990 previously filed for 1985. In an attachment to the newly filed 1985 Form 1120, the plaintiff explained that it filed the new Form 1120 returns for tax years 1985 and 1986 on September 15, 1987, because, according to BCW, "the aggregate, incremental changes in its operations that had occurred during the years prior to 1985 had been so material that, as of January 1, 1985, BCW no longer qualified for exemption under IRC § 501(c)(4)."

On the newly filed 1985 Form 1120, the plaintiff reported a net operating loss (NOL) of $36,887,982.00, which included a $5,450,687.00 NOL carryover from earlier years. The newly filed Form 1120 for tax year 1986 indicated a consolidated NOL for 1986 of $85,943,938.00, which was comprised of an $80,013,968.00 NOL for BCW, and $5,929,970.00 for the other related corporations. The $80,013,968.00 NOL claimed by BCW included the $36,887,982.00 NOL carried over from tax year 1985.

In 1988, the IRS District Director of the Milwaukee, Wisconsin District initiated audits that included a review of the income tax returns of BCW for tax years 1985 and 1986, as well as the returns of CHSIC, UWS, UWIC, UWLIC, LUI, and Proservices for those and other years. The IRS investigated whether BCW's attempt to change its tax status to become a taxable entity for tax years 1985 and 1986 should be allowed. On September 27, 1988, a request was submitted to the IRS Office of the Assistant Commissioner for technical advice on BCW's tax

status. On July 24, 1991, that office issued a Technical Advice Memorandum, concluding that the plaintiff, as well as Blue Cross and Blue Shield organizations generally, was tax-exempt until January 1, 1987. In addition, the IRS Chief Counsel's office issued a General Counsel Memorandum, concurring in this conclusion.

After concluding the audits of the Blue Cross entities, an examination report was issued on October 17, 1991. In letters issued that same day, the IRS District Director of the Milwaukee District proposed certain adjustments to the tax returns of BCW, CHSIC, UWS, and UWIC, including the treatment of BCW as a tax-exempt organization until January 1, 1987, pursuant to IRC § 501(c)(4).

In December of 1991, some of BCW's subsidiaries filed protests with the IRS, contesting certain findings in the October 17, 1991 letters. One of the disputed findings was the District Director's claim that BCW was a tax-exempt entity in tax years 1985 and 1986; the subsidiaries argued that BCW was subject to federal income tax in those years. On January 6, 1992, the protests were assigned to the Milwaukee, Wisconsin Appeals Office for review. Ultimately, a settlement was reached, which included a Closing Agreement between BCW and the IRS. The agreement was executed on January 22, 1993, by C. Edward Mordy, Vice President of BCW, and on April 27, 1993, by Timothy I. Gukich, the IRS Associate Chief of Milwaukee Appeals, for the Commissioner of the IRS.

With respect to BCW's taxable status for tax years 1985 and 1986, the Closing Agreement stated that BCW would be considered tax-exempt during 1985 and 1986: "NOW IT IS HEREBY DETERMINED AND AGREED for Federal income tax purposes that: (1) Prior to 1987, the taxpayer was, per section 501, Subtitle A, IRC, an organization exempt from taxation." Despite the statement in the Closing Agreement that the plaintiff would be considered a tax-exempt entity for tax years 1985 and 1986, in the

**6.** The 1986 Form 1120 was a "consolidated tax return" in that BCW reported as the parent corporation of an affiliated group of corporations that included CHSIC and UWS (each of which

was a wholly-owned subsidiary of BCW), and UWLIC, UWIC, LUI, and Proservices (each of which were wholly-owned subsidiaries of UWS).

**700**

Closing Agreement, BCW was permitted a $25,000,000.00 NOL for tax years 1984, 1985, and 1986, which could be carried over to 1987 and later years.[7] Finally, subparagraph (e) of paragraph 3 of the Closing Agreement states:

> (3) As of January 1, 1987, the taxpayer was an "Existing Blue Cross or Blue Shield organization" as this term is defined in subparagraph (c)(2) of section 833, Subtitle A, IRC. As such, the following attributes apply to the taxpayer as of that date: ... (e) the taxpayer's January 1, 1987 loss reserve for incurred-but-not-paid claims will be determined in accordance with actual claims paid data for 1987[.]

For its taxable year 1987, BCW filed a federal income tax return, the Form 1120, as a taxable entity on September 15, 1988. Plaintiff reported that it was an insurance company for federal income tax purposes and was taxable under IRC §§ 831, 832, and related provisions. On the original 1987 return, BCW did not claim to be an "Existing Blue Cross or Blue Shield organization" within the meaning of IRC § 833 or the "Special Rules for Existing Blue Cross or Blue Shield organizations" contained in section 1012(c)(3) of the Tax Reform Act of 1986(TRA). The Tax Reform Act of 1986, Pub.L. No. 99–514, § 1012(c)(3), 100 Stat. 2085, 2394 (1986) (hereinafter TRA § 1012(c)(3)).

On its original 1987 return, BCW claimed an IRC § 832(c)(4) deduction for "losses incurred" in the amount of $190,155,418.00. To arrive at that number, BCW determined its "discounted unpaid losses outstanding at the end of 1986" to be $85,352,778.00. According to BCW, it calculated this number by:

> (a) starting with the estimate of the amount needed to satisfy total claims unpaid as of that date, as reported on its 1986 Annual Statement for 1986 ($78,421,-394.00)[8]; (b) adding estimated loss adjustment expenses ($9,953,826.00); and (c)

multiplying the total of (a) and (b) by .9658, the discounting factor to be applied pursuant to IRC § 846.

In a "Statement Attached To and Made Part of" the original 1987 return, BCW stated that it had increased the amount of its unpaid loss reserve from 1985 to 1986, but that the increase did not constitute "reserve strengthening," as follows:

> During calendar year 1986, the Taxpayer and certain of its subsidiaries had additions to reserves attributable to an increase in estimate of reserves established for prior accident years as well as an increase in the estimate for the 1986 accident year. These increases were necessary and customary in its determination of unpaid loss reserves.

> The Taxpayer believes these additions to the reserves are reasonable additions representing actual unpaid losses which do not constitute "reserve strengthening" under the Act [the Tax Reform Act of 1986], even though these additions might otherwise constitute reserve strengthening as it was defined in Internal Revenue Service Advance Notice 88–100[, 1988 WL 561166].

> Accordingly, the Taxpayer has not taken into account, in determining taxable income, the difference between the undiscounted and the discounted unpaid losses at the end of 1986.

On or about March 25, 1992, the IRS District Director of the Milwaukee District initiated an audit of the consolidated income tax returns filed by plaintiff for tax years 1987–1989. On August 1, 1993, BCW filed a second federal income tax return, Form 1120, for tax year 1987 with the revenue agent who had already begun an audit of the original returns filed by BCW for 1987–1989. The plaintiff stated that it provided "a revised Form 1120 for Plaintiff's tax year 1987, which the Examining Agent treated as an amended return."

---

7. As plaintiff notes, the $25,000,000.00 NOL accorded BCW by the Closing Agreement was considerably less than the approximately $80,000,000.00 NOL claimed by BCW on its originally filed returns.

8. In February, 1987, BCW filed with both the OCI and NAIC its 1986 Annual Statement, which stated that its total claims unpaid (undiscounted unpaid losses, excluding the loss adjustment expense reserve) as of December 31, 1986 was $78,421,394.00.

On the amended Form 1120 for 1987, BCW recomputed its taxable income, modifying the IRC § 832(c)(4) deduction for "losses incurred" to $227,372,878.00, an increase of $37,217,460.00 over the deduction for "losses incurred" claimed on the original 1987 return ($190,155,418.00). According to the plaintiff, the Closing Agreement required BCW to use its "actual claims paid data," in lieu of the actuarial estimate that appears on the 1986 Annual Statement, to compute its "opening 1987 unpaid loss reserve." To arrive at the new deduction of $227,372,878.00, BCW amended its "discounted unpaid losses outstanding at the end of 1986" to $43,483,840.00, a decrease of $41,868,938.00 below the $85,352,778.00 previously reported on BCW's original Form 1120 return for 1987. According to BCW, it computed the new $43,483,840.00 number by:

(a) starting with the amount actually paid during 1987 on claims that were incurred but not paid as of January 1,1987, as reported on the 1987 Annual Statement ($42,267,000.00);[9] (b) adding loss adjustment expenses ($2,756,649.00); and (c) multiplying the total of (a) and (b) by .9658, the discounting factor to be applied pursuant to IRC § 846.

During the audit of the 1987–1989 returns, the IRS disallowed BCW's modified figure for the unpaid loss reserve outstanding as of December 31, 1986, which appeared on the 1987 amended return. In other words, BCW was not permitted to determine its loss reserve for unpaid claims as of December 31, 1986 "in accordance with actual claims paid data."

Upon the conclusion of the audit adjustments for tax year 1987 for all the related entities, the IRS computed the consolidated taxable income and tax deficiency. In the computation, pursuant to the Closing Agreement, BCW was accorded a $25,000,000.00

NOL carryover from 1986, and a $17,650,879.00 "special deduction" under IRC § 833(b), resulting in no taxable Income for 1987. However, BCW did incur tax liability for 1987 in the amount of $514,459.00, which consisted of an alternative minimum tax in the amount of $487,603.00, and an environmental tax of $26,856.00.

Since BCW and its subsidiaries had already paid a certain amount of tax with the 1987 amended return, the IRS' Notice of Deficiency mailed March 31, 1994 asserted a tax deficiency for 1987 in the amount of $430,350.00. In this notice, the IRS asserted that BCW's unpaid loss reserve as of December 31, 1986, was $80,679,096.00. According to the plaintiff, this amount was computed by "(a) starting with the amount of total claims unpaid, as reported on the 1987 Annual Statement ($78,421,394.00); (b) adding loss adjustment expenses ($5,114,635.00); and (c) multiplying the total of (a) and (b) by .9658, the discounting factor to be applied pursuant to IRC Section 846."

On or about August 19, 1994, plaintiff paid $790,812.17 to the IRS, representing the assessed tax deficiency ($430,350.00) and the assessed interest ($360,462.17) for 1987. On September 15, 1994, BCW and its subsidiaries filed a timely refund claim for tax year 1987 in the amount of $874,921.17 (tax of $514,459.00 plus interest paid of $360,462.17). In the 1987 refund claim, BCW maintained that, pursuant to statute and the terms of the Closing Agreement, it was permitted to determine its loss reserve for unpaid claims as of December 31, 1986 in accordance with actual claims paid data for 1987. In the refund claim, BCW computed its "opening 1987 loss reserve" to be $45,023,649.00. Therefore, according to the plaintiff, its losses incurred deduction for the 1987 taxable year should be increased by $37,195,256.00.[10]

9. In February, 1988, BCW filed its annual statement for 1987 with both the NAIC and OCI. As described by the plaintiff, on the second Form 1120 for 1987, in order to calculate its discounted unpaid losses at the end of 1986, the plaintiff employed "the amount actually paid during 1987 on total claims that were unpaid as of December 31, 1986 [,which] was $42,267,000," as reported on its 1987 annual statement.

10. The plaintiff apparently arrived at this figure by calculating the difference between $83,536,029.00 and $45,023,649.00, with appropriate discounting. The plaintiff employed $83,536,029.00 as the IRS-determined unpaid loss reserve as of December 31, 1986, not $ 80,679,096.00, the number the IRS claimed to be the correct amount in its March 31, 1994 notice.

In a letter dated March 29, 1996, the Milwaukee Appeals Office of the IRS disallowed the 1987 refund claim in full. Pursuant to IRC § 6532, in 1998, the plaintiff and the Regional Director of Appeals executed Form 907, agreeing that plaintiff was entitled to bring suit to recover on the refund claims on or before December 31, 1998. The plaintiff timely commenced this action for refund under IRC §§ 7422 and 6532.

## DISCUSSION

The parties have filed cross-motions for partial summary judgment. RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar both in language and effect. Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Telemac Cellular Corp. v. Topp Telecom, Inc.,* 247 F.3d 1316, 1323 (Fed.Cir.), *reh'g denied and reh'g en banc denied* (2001); *Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d 1253, 1257 (Fed.Cir.2001); *Avenal v. United States,* 100 F.3d 933, 936 (Fed.Cir. 1996), *reh'g denied* (1997); *Creppel v. United States,* 41 F.3d 627, 630–31 (Fed.Cir.1994). A fact is material if it will make a difference in the result of a case under the governing law. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 247–48, 106 S.Ct. 2505; *see also Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d at 1257; *Curtis v. United States,* 144 Ct.Cl. 194, 199, 168 F.Supp. 213, 216 (1958), *cert. denied,* 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959), *reh'g denied,* 361 U.S. 941, 80 S.Ct. 375, 4 L.Ed.2d 361 (1960).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Ford Motor Co. v. United States,* 157 F.3d 849, 854 (Fed.Cir. 1998) (the nature of a summary judgment proceeding is such that the trial judge does not make findings of fact); *Johnson v. United States,* 49 Fed. Cl. 648, 651 (2001), *aff'd,* 52 Fed.Appx. 507, 2002 WL 31724971 (Fed. Cir. Dec.3, 2002); *Becho, Inc. v. United States,* 47 Fed.Cl. 595, 599 (2000). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250–52, 106 S.Ct. 2505; *Jay v. Sec'y of Dep't of Health and Human Servs.,* 998 F.2d 979, 982 (Fed. Cir.), *reh'g denied and en banc suggestion declined* (1993). When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Hall v. Aqua Queen Mfg., Inc.,* 93 F.3d 1548, 1553 n. 3 (Fed.Cir.1996). In such a case, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings. Summary judgment:

> saves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. "Useless" in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result.

*Dehne v. United States,* 23 Cl.Ct. 606, 614–15 (1991) (citing *Pure Gold, Inc. v. Syntex, Inc.,* 739 F.2d 624, 626 (Fed.Cir.1984)), *vacated on other grounds,* 970 F.2d 890 (Fed.Cir.1992); *United States Steel Corp. v. Vasco Metals Corp.,* 55 C.C.P.A. 1141, 394 F.2d 1009, 1011 (C.C.P.A.1968).

Summary judgment, however, will not be granted if "the dispute about a material fact

is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. 2505; *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 971 (Fed.Cir.2001), *cert. denied*, 534 U.S. 1109, 122 S.Ct. 913, 151 L.Ed.2d 879 (2002); *Gen. Elec. Co. v. Nintendo Co.*, 179 F.3d 1350, 1353 (Fed.Cir. 1999). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. at 587–88, 106 S.Ct. 1348; *Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d at 1257; *Wanlass v. Fedders Corp.*, 145 F.3d 1461, 1463 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (1998).

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Trilogy Communications, Inc. v. Times Fiber Communications, Inc.*, 109 F.3d 739, 741 (Fed.Cir.) (quoting *Conroy v. Reebok Int'l. Ltd.*, 14 F.3d 1570, 1575 (Fed.Cir.1994), *reh'g denied and en banc suggestion declined* (1995)), *reh'g denied and en banc suggestion declined* (1997); *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1569 (Fed.Cir.1997). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. 2548; *Am. Airlines v. United States*, 204 F.3d 1103, 1108 (Fed. Cir.2000); *see also Schoell v. Regal Marine Indus., Inc.*, 247 F.3d 1202, 1207 (Fed.Cir. 2001).

Pursuant to RCFC 56, a motion for summary judgment may succeed whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. 2548. Generally, however, in order to prevail by demonstrating that a genuine issue for trial exists, the nonmoving party must go beyond the pleadings by use of evidence such as affidavits, depositions, answers to interrogatories and admissions. *Id.*

Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, however, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case. *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987)); *Chevron USA, Inc. v. Cayetano*, 224 F.3d 1030, 1037 n. 5 (9th Cir. 2000), *cert. denied*, 532 U.S. 942, 121 S.Ct. 1403, 149 L.Ed.2d 346 (2001). "[S]imply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.*, 401 F.2d 689, 692 (4th Cir.1968), *cert. denied*, 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969); *see also B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 593 (6th Cir.2001); *Massey v. Del Labs., Inc.*, 118 F.3d 1568, 1573 (Fed.Cir.1997). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other necessarily is justified. *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d at 593; *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir.2000); *Allstate Ins. Co. v. Occidental Int'l., Inc.*, 140 F.3d 1, 2 (1st Cir.1998); *Reading & Bates Corp. v. United States*, 40 Fed.Cl. 737, 748 (1998). The court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration. *DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1322 (Fed.Cir. 2001); *Gart v. Logitech, Inc.*, 254 F.3d 1334,

1338–39 (Fed.Cir.2001), *cert. denied,* 534 U.S. 1114, 122 S.Ct. 921, 151 L.Ed.2d 886 (2002). After reviewing the parties' submissions, the court finds that there are no material facts in dispute.

The cross-motions for partial summary judgment submitted by the parties focus solely on the method of determining BCW's unpaid losses outstanding as of December 31, 1986 for the purpose of calculating the plaintiff's IRC § 832(c)(4) losses incurred deduction. The plaintiff maintains that it is required to compute its "opening 1987 loss reserve" for unpaid claims in accordance with its actual claims paid data for 1987; that is, in accordance with the actual amounts paid out during 1987 in satisfaction of its unpaid claims as of January 1, 1987. Defendant, in contrast, maintains that this amount should be computed by employing the actuarial estimate of BCW's unpaid loss reserve as of December 31, 1986, as reported on BCW's annual statement.

**The Statutes and Regulations**

■   Certain statutory provisions concerning the federal income taxation of insurance companies are relevant to this case. IRC §§ 831 and 832 relate generally to the federal income taxation of property and casualty (P & C) insurance companies, which are non-life insurance companies, such as BCW. Pursuant to IRC § 831(a), for each taxable year, taxes are imposed on the "taxable income" of every P & C insurance company. Section 832(a) of the IRC provides that " 'taxable income' means the gross income as defined in subsection [IRC § 832](b)(1) less the deductions allowed by subsection (c)." Section 832(b)(1)(A) of the IRC states:

**(1) Gross income**

The term "gross income" means the sum of–

(A) the combined gross amount earned during the taxable year, from investment income and from underwriting income as provided in this subsection, computed on the basis of the underwriting and investment exhibit of the annual statement approved by the National Association of Insurance Commissioners[.]

IRC § 832(b)(1)(A). "Underwriting income" is defined as "the premiums earned on insurance contracts during the taxable year less losses incurred and expenses incurred." IRC § 832(b)(3). Section 832(c) of the IRC provides that: "In computing the taxable income of an insurance company subject to the tax imposed by section 831, there shall be allowed as deductions: ... (4) losses incurred, as defined in subsection (b)(5) of this section[.]"

Prior to the TRA, P & C insurers were permitted a full deduction for loss reserves as "losses incurred." In each taxable year, in addition to the losses paid (with adjustments for salvage and reinsurance), the full amount of the loss reserve, reduced by the amount of the loss reserve claimed for the prior taxable year, was treated as a deductible business expense. 26 U.S.C. §§ 832(c)(4), 832(b)(5) (1982). As a result, a P & C insurer could "take, in effect, a current deduction for future loss payments without adjusting for the 'time value of money'— the fact that '[a] dollar today is worth more than a dollar tomorrow.' " *Atl. Mut. Ins. Co. v. Comm'r,* 523 U.S. at 384, 118 S.Ct. 1413 (citations omitted).

Section 1023 of the TRA amended the IRC by adding a new section, IRC § 846. Section 846 of the IRC provides that, for taxable years beginning after December 31, 1986, P & C insurers were required to discount unpaid losses to present value when claiming them as a deduction. However, without a transitional rule for the 1987 tax year, when computing the losses incurred deduction for that year, P & C insurers would have subtracted undiscounted year-end 1986 reserves from discounted year-end 1987 reserves, resulting in artificially low deductions. *Atl. Mut. Ins. Co. v. Comm'r,* 523 U.S. at 384, 118 S.Ct. 1413. The TRA alleviated this effect by requiring P & C insurers to discount 1986 reserves for purposes of the 1987 tax computation. *See* TRA § 1023(e); note following IRC § 846.

After the enactment of the TRA, IRC § 832(b)(5) "Losses incurred" read in pertinent part:

**(A) In general**

The term "losses incurred" means losses incurred during the taxable year on insurance contracts, computed as follows:

(i) To losses paid during the taxable year, add salvage and reinsurance recoverable outstanding at the end of the preceding taxable year and deduct salvage and reinsurance recoverable outstanding at the end of the taxable year.

(ii) To the result so obtained, add all unpaid losses on life insurance contracts plus all discounted unpaid losses (as defined in section 846) outstanding at the end of the taxable year and deduct unpaid losses on life insurance contracts plus all discounted unpaid losses outstanding at the end of the preceding taxable year.

**(B) Reduction of deduction**

The amount which would (but for this subparagraph) be taken into account under subparagraph (A) shall be reduced by an amount equal to 15 percent of the sum of–

(i) tax-exempt interest received or accrued during such taxable year, and

(ii) the aggregate amount of deductions provided by sections 243, 244, and 245 for–

(I) dividends (other than 100 percent dividends) received during the taxable year, and

(II) 100 percent dividends received during the taxable year to the extent attributable to prorated amounts.

In the case of a 100 percent dividend paid by an insurance company, the portion at-tributable to prorated amounts shall be determined under subparagraph (E)(ii).

IRC § 832(b)(5). Therefore, to calculate the "losses incurred" deduction, it is necessary to determine the amount of unpaid losses at both the end of the current taxable year and the end of the preceding taxable year. As noted above, "unpaid losses," or the loss reserve, generally refer to the unpaid losses reported on the NAIC annual statement filed by the taxpayer for the year ending with or within the taxable year of the taxpayer, plus the amount of estimated claim adjudication expenses.[11] IRC §§ 846(b), 846(f)(2) and 832(b)(6).

Finally, prior to the TRA, Blue Cross or Blue Shield organizations were tax-exempt organizations. As a result of the enactment of section 1012 of the TRA, Blue Cross or Blue Shield organizations became taxable entities, beginning with tax year 1987, as if they were regular P & C insurance companies under IRC §§ 831–835. Section 1012 of the TRA provided a new Code provision, IRC § 833, the provision through which Blue Cross or Blue Shield organizations became taxable entities.

IRC § 833 applies to "Existing Blue Cross or Blue Shield organizations," and to certain other organizations. An "Existing Blue Cross or Blue Shield organization" generally refers to any Blue Cross or Blue Shield organization which (a) was in existence on August 16, 1986; (b) was determined to be exempt from tax for its last taxable year beginning before January 1, 1987; and (c) did not have a "material change" in operations or structure after August 16, 1986 and

---

**11.** For purposes of the "losses incurred" deduction, the term, "unpaid losses," or "loss reserve," is an actuarially determined estimate, as of a point in time, and is comprised of three amounts that an insurer expects to pay on: (1) claims that have been reported, but not yet paid; plus (2) claims that have been incurred, but not yet reported; plus (3) an estimate of internal expenses that will be required to adjudicate the claims in the first two categories.

BCW annually determines its loss reserve as of December 31st in order to report that amount on the NAIC annual statement. However, the loss reserve is not reported as a single amount on the annual statement; rather, the loss reserve is divided into two constituent amounts on the annual statement. The first two "elements" of the loss reserve (i.e., estimates of the amounts needed to pay claims that have been reported, but not yet paid and that have been incurred, but not reported, as of December 31st of each year) are added together and reported as the "total claims unpaid" on the annual statement. The third element of the loss reserve, unpaid loss adjustment expenses (i.e., an estimate of the internal costs required to adjudicate the "total claims unpaid"), also appears on the annual statement. *See* IRC § 846(f)(2). Therefore, the total claims unpaid and the unpaid loss adjustment expenses, as reported on the annual statement, must be added together to determine the amount of "unpaid losses" for purposes of the losses incurred deduction. *See id.*

before the close of the taxable year. IRC § 833(c)(2). Organizations that meet this definition became subject to federal income tax, pursuant to IRC § 833, for taxable years beginning after December 31, 1986. Under IRC § 833(a)(1), any such organization is taxable under IRC § 831 et seq., "in the same manner as if it were a stock insurance company." However, IRC § 833 also accorded these organizations special income tax rules that were not available to other insurers subject to tax under IRC § 831. For instance, Blue Cross or Blue Shield organizations were permitted a "special deduction" under IRC § 833(b).

The plaintiff argues that, regardless of the language of the Closing Agreement, it is entitled to partial summary judgment because its method of computing its "opening 1987 reserve was fully consistent with, and mandated by, the applicable statutory provisions." More specifically, the plaintiff contends that, pursuant to the TRA, it was required to employ its actual claims paid data for 1987 to compute its opening 1987 loss reserve for incurred-but-not-paid claims. The defendant, however, argues that no provision of law permits the plaintiff to compute its 1987 IRC § 832(c)(4) deduction in this manner. To the contrary, the defendant maintains that the plaintiff is required by IRC §§ 832(b)(5) and 846 to use the actuarial estimate on its annual statement to compute its reserve for unpaid losses as of December 31, 1986.[12]

IRC §§ 832(b)(5) and 846 plainly support the defendant's position that, for the purpose of computing the IRC § 832(c)(4) losses incurred deduction, BCW is required to employ the estimate for unpaid losses that appears on BCW's annual statement. As noted, IRC § 832(c)(4) provides a deduction for "losses incurred, as defined in subsection (b)(5) of this section." Section 832(b)(5) of the IRC states:

**(A) In general**

The term "losses incurred" means losses incurred during the taxable year on insurance contracts, computed as follows:

(i) To losses paid during the taxable year, add salvage and reinsurance recoverable outstanding at the end of the preceding taxable year and deduct salvage and reinsurance recoverable outstanding at the end of the taxable year.

(ii) To the result so obtained, add all unpaid losses on life insurance contracts plus all discounted unpaid losses (as defined in section 846) outstanding at the end of the taxable year and deduct unpaid losses on life insurance contracts plus all discounted unpaid losses outstanding at the end of the preceding taxable year.

IRC § 832(b)(5).

Section 832(b)(5) of the IRC references IRC § 846, which outlines the discounting formula that should be applied to unpaid losses. Significantly, IRC § 846(b)(1) states that the "'undiscounted unpaid losses,'" to which the discounting formula is applied, "means the unpaid losses shown in the annual statement filed by the taxpayer for the year ending with or within the taxable year of the taxpayer." In other words, for the purpose of computing the IRC § 832(c)(4) deduction, IRC § 832(b)(5), pursuant to IRC § 846, requires the use of the unpaid losses outstanding at the end of the preceding taxable year, as shown on the annual statement.

Therefore, the plaintiff's argument is contrary to the explicit language of IRC § 846(b)(1). Indeed, in its brief in support of its motion for partial summary judgment, the

---

12. According to the defendant, the plaintiff's use of its actual claims paid data for 1987 on the amended Form 1120, in lieu of the actuarial estimate of its unpaid loss reserve as of December 31, 1986, resulted in an approximately $37 million increase in the plaintiff's losses incurred deduction, which, in turn, generated a lower taxable income for BCW in tax year 1987. More specifically, the defendant states that:

the $37 million decrease in the 1986 year-end unpaid loss reserve ("the January 1, 1987 loss reserve for incurred-but-not-paid claims," as

plaintiff refers to it) claimed by plaintiff under its view of ¶ 3(e) effectively transforms $37 million of the $80 million NOL carryover originally claimed into a $37 million increase in the § 832(c)(4) deduction for 1987, decreasing 1987 taxable income (and increasing the NOL available to carry over from 1987 to later years) by $37 million. The tax effect is the same as allowing a total NOL carryover into 1987 of approximately $62 million, rather than the $25 million agreed on in the closing agreement.

plaintiff concedes that IRC §§ 832(b)(5) and 846 state "the general rule" that, in computing the IRC § 832(c)(4) losses incurred deduction, the actuarial estimate of year-end loss reserves, as reported on the annual statement, must be employed.[13]

While conceding this general rule, the plaintiff argues that the general rule should not be employed in the instant case. According to the plaintiff, IRC §§ 832 and 846 "require a comparison between year-end reserves reported on the annual statements of the *taxpayer*' for the *taxable* year' and for 'the preceding *taxable* year.'" (Emphasis in original). Plaintiff maintains that defendant "overlooks the fact that Blue Cross organizations became subject to these provisions for the first time in 1987, that such organizations were not *taxpayers*' prior to 1987, and that Congress recognized the need for a specific transitional rule for such organizations." (Emphasis in original). Therefore, the plaintiff argues that, since Blue Cross organizations only became taxable in 1987, TRA § 1012(c)(3)(C) should be employed. According to the plaintiff, TRA § 1012(c)(3)(C) permits Blue Cross and Blue Shield organizations essentially to ignore IRC §§ 832 and 846, and use their actual claims paid in computing the losses incurred deduction for tax year 1987.

Section 1012(c)(3) of the TRA provides special transitional rules for Blue Cross and Blue Shield organizations, as they became taxable entities for the first time in 1987.

More specifically, the plaintiff underscores TRA § 1012(c)(3)(C), which reads: "RESERVE WEAKENING AFTER AUGUST 16, 1986.—Any reserve weakening after August 16, 1986, by an existing Blue Cross or Blue Shield organization shall be treated as occurring in such organization's 1st taxable year beginning after December 31, 1986." As the plaintiff notes, the apparent policy rationale underlying the enactment of TRA § 1012(c)(3)(C) was to prevent Blue Cross or Blue Shield organizations from arbitrarily reducing their unpaid loss reserve as of December 31, 1986, which would result in the reduction of taxable income in 1987.

The plaintiff also contends that TRA § 1012(c)(3)(C) "is an express Congressional directive that the general reserving rules of §§ 832 and 846 had to be modified in the case of newly taxed Blue Cross or Blue Shield organizations." However, the language of TRA § 1012(c)(3)(C) does not support plaintiff's contention. Nor does the language of TRA § 1012(c)(3)(C) indicate that actual claims paid data should be utilized, in lieu of the actuarial estimate that appears on the annual statement, to calculate the unpaid loss reserve. To support its position, the plaintiff makes the following legal argument, which the court rejects.

First, the plaintiff asserts that TRA § 1012(c)(3)(C), "Reserve Weakening After August 16, 1986," should be invoked in this case.[14] Second, the plaintiff argues that the

---

**13.** Although there is not much written on this topic, the IRS articulated this reading of the statute in a Technical Advice Memorandum. *See* Priv. Rul. 9330002 (Tech.Adv.Mem.) (Apr. 13, 1993). Like BCW, the taxpayer discussed in the Memorandum pointed to language in the General Explanation of the Tax Reform Act of 1986 as the basis for its use of actual claims paid data for 1987 to redetermine its unpaid loss reserve as of December 31, 1986. Staff of Joint Comm. on Taxation, 99th Cong., General Explanation of the Tax Reform Act of 1986 590 (Comm. Print 1987) (hereinafter "1986 Blue Book"). However, in the April 13, 1993 Memorandum, the IRS maintained that the 1986 Blue Book language is contrary to the statutes:

The 1986 Blue Book language [i.e., the use of actual claims paid data] is contrary to sections 846(b)(1) and 833(b)(3)(B) of the Code.... In view of the unambiguous language of sections 846(b)(1) and 833(b)(3)(B) of the Code and section 1012(c)(3)(C) of the 1986

Act, we question whether the statute on its face permits the interpretation given by the colloquy and the 1986 Blue Book.

Priv. Rul. 9330002 (Tech.Adv.Mem.) (Apr. 13, 1993). The IRS did not profess to have an opinion as to whether the taxpayer discussed in the Memorandum may adjust its unpaid loss reserve as of December 31, 1986, based on its actual claims paid for tax year 1987. The IRS stated that it was only accepting the use of actual claims paid "for purposes of this memorandum" and for the sake of argument since it was not the issue in the case. It should be noted that the Memorandum states that: "This document may not be used or cited as precedent. Section 6110(j)(3) of the Internal Revenue Code." Priv. Rul. 9330002 (Tech.Adv.Mem.) (Apr. 13, 1993).

**14.** It is unclear why the plaintiff is arguing that TRA § 1012(c)(3)(C) should be invoked in this case, other than the fact that it is one of the "Special Rules for Existing Blue Cross or Blue

term, "reserve weakening," and "the meaning of [TRA] § 1012(c)(3)(C)" are ambiguous. Third, given this ambiguity, the plaintiff maintains that legislative history must be examined to clarify the term, reserve weakening, and the operation of TRA § 1012(c)(3)(C). Therefore, the plaintiff points to the 1986 Blue Book and a September 27, 1986 colloquy on the Senate floor as sources of explanatory legislative history to indicate that, in the context of reserve weakening, actual claims paid data for 1987 should be employed to calculate the unpaid loss reserve at the end of 1986.[15] The legislative history in the third prong of plaintiff's argument is the only reference to the use of "actual claims paid data" cited in support of plaintiff's position; those words do not appear in TRA § 1012(c)(3)(C). However, as will be demonstrated below, the court does not reach an analysis of this legislative history because the premise upon which plaintiff relies, that reserve weakening occurred in this case, fails due to lack of supporting evidence.

As noted, the first premise of plaintiff's argument is that TRA § 1012(c)(3)(C) should be invoked in this case. The defendant asserts that this provision is not applicable because reserve weakening did not occur in this case. In order to determine whether "reserve weakening" occurred in this case, the court must consider the dispute between the parties regarding the ambiguity of the

term. The defendant maintains that the term, "reserve weakening," is defined as a decrease in the estimate of reserves. In contrast, the plaintiff claims the term is ambiguous. According to the plaintiff:

> "reserve weakening" (as used in TRA § 1012(c)(3)(C)) does not relate to "any" reduction in a loss reserve, but means only an "artificial" weakening, presumably meaning a reduction without an economic justification. Plaintiff's contention is that the reserve weakening rule should be interpreted as the Blue Book and Colloquy provide.

In *Atlantic Mutual Insurance Company*, the Supreme Court resolved the ambiguity in the related term, "reserve strengthening," not reserve weakening, in the context of TRA § 1023(e)(3)(B), which concerns required income adjustments under IRC § 481 attributable to reserve strengthening. *Atl. Mutl. Ins. Co. v. Comm'r*, 523 U.S. at 389–91, 118 S.Ct. 1413. Noting that the TRA does not define the term, "reserve strengthening" (the term, "reserve weakening," also is not defined in the statute), the Court examined Treasury Department Regulation 26 C.F.R. § 1.846–3(c) (1997). *Id.* at 387, 118 S.Ct. 1413. The Court stated that: "[s]ince the term 'reserve strengthening' is ambiguous, the task that confronts us is to decide, not whether the Treasury regulation represents the best interpretation of the statute, but whether it represents a reasonable one." *Id.*

---

Shield Organizations." The plaintiff does not specifically claim that its reserves were weakened in 1986.

15. The plaintiff cites to the following excerpt from the 1986 Blue Book:

> Existing Blue Cross/Blue Shield organizations are required to compute their ending 1986 loss reserves without artificial changes that would reduce 1987 income. This rule as to reserve weakening is to be applied so that the incurred-but-not-paid claims reserve at the end of 1986 will be redetermined using actual paid claims data for 1987. That amount will be used for purposes of determining both the surplus at December 31, 1986, and the opening loss reserve at January 1, 1987. Use of actual experience to determine those amounts will eliminate potential controversy over the proper amount of the surpluses and reserves for 1987 tax purposes. The loss reserve then will be adjusted, as appropriate, by the rules of section

1023 of the Act requiring the discounting of unpaid losses.

The plaintiff also cites to the following excerpt from the colloquy, in which Senator Packwood stated:

> The conferees wanted to make clear that the organizations' 1986 loss reserves would not be changed artificially to reduce taxable income in 1987. We intend that the incurred-but-not-paid claims reserve at the end of 1986 will be the claims incurred in 1986 and actually paid in 1987. That amount will be used for purposes of both determining both the surplus at December 31, 1986, and the opening loss reserve at January 1, 1987. Use of actual experience to determine those amounts will eliminate potential controversy over the proper amount of the surpluses and reserves for 1987 tax purposes.

132 Cong. Rec. S13,898 (daily ed. Sept. 27, 1986) (clarified by 132 Cong. Rec. S14,385 (daily ed. Oct. 1, 1986)) (statement of Sen. Packwood).

at 389, 118 S.Ct. 1413. In addition to implementing section 1023(e) for purposes of the treatment of the difference between the undiscounted and the discounted unpaid losses at the end of 1986, section 1.846–3 also established rules for determining the amount of "reserve strengthening:"

(c) *Rules for determining the amount of reserve strengthening (weakening)–*

(1) *In general.* The amount of reserve strengthening (*weakening*) is the amount that is determined under paragraph (c)(2) or (3) to have been added to (subtracted from) an unpaid loss reserve in a taxable year beginning in 1986. For purposes of section 1023(e)(3)(B) of the 1986 Act, the amount of reserve strengthening (*weakening*) must be determined separately for each unpaid loss reserve by applying the rules of this paragraph (c). This determination is made without regard to the reasonableness of the amount of the unpaid loss reserve and without regard to the taxpayer's discretion, or lack thereof, in establishing the amount of the unpaid loss reserve.

\*   \*   \*   \*   \*   \*

(3) *Accident years before 1986*—(i) *In general* For each taxable year beginning in 1986, the amount of reserve strengthening (*weakening*) for an unpaid loss reserve for an accident year before 1986 is the amount by which the reserve at the end of that taxable year exceeds (is less than)–

(A) The reserve at the end of the immediately preceding taxable year; reduced by

(B) Claims paid and loss adjustment expenses paid ("loss payments") in the taxable year beginning in 1986 with respect to losses that are attributable to the reserve. . . . [16]

§ 1.846–3(c) (emphasis added).

On the basis of this regulation, the Supreme Court concluded that: "In short, any.

net additions to reserves (with two exceptions not here at issue, § 1.846–3(c)(3)(ii)) constitute 'reserve strengthening[.]' " [17] *Atl. Mut. Ins. Co. v. Comm'r,* 523 U.S. at 386, 118 S.Ct. 1413. The Court held that the Treasury regulation "represents a reasonable interpretation of the term 'reserve strengthening[.]' " *Id.* at 391, 118 S.Ct. 1413.

Therefore, the ambiguity in the term "reserve strengthening" has been resolved by the Supreme Court, which found that "reserve strengthening" is defined as any net additions to reserves. The words of § 1.846–3 indicate that reserve weakening is merely the converse of reserve strengthening; when strengthening is mentioned in the regulation, it is immediately followed by the word, "weakening," in parentheses. The term, "reserve weakening," therefore, logically refers to any net reductions in reserves.

The plaintiff, however, argues that the term, "reserve strengthening," at issue in *Atlantic Mutual Insurance Company v. Commissioner of Internal Revenue* actually referred to a different provision, TRA § 1023(e)(3)(B), not the reserve weakening provision at issue here, TRA § 1012(c)(3)(C): "[d]efendant's argument is based on the definition of the term 'reserve strengthening' in TRA § 1023(e)(3)(B), as implemented by Treas. Reg. § 1.846–3(c). Defendant assumes, without analysis, that Treas. Reg. § 1.846–3(c) can be used to interpret the term 'reserve weakening' under TRA § 1012(c)(3)(C)." While it is true that § 1.846–3(c) does not explicitly refer to TRA § 1012(c)(3)(C), there is no evidence to suggest that the IRS intended reserve weakening to mean one thing in one part of the statute (TRA § 1023(e)(3)(B)), and something else in another part of the same statute (TRA § 1012(c)(3)(C)).[18]

**16.** It should be noted that the section of § 1.846–3 cited above and by the Supreme Court is identical to the 2003 version of this regulation.

**17.** It should be noted that the exceptions in the regulation referred to by the Supreme Court do not apply to the present case. *See* 26 C.F.R. § 1.846–3(c)(3)(ii) (2003).

**18.** The April 13, 1993 IRS Technical Advice Memorandum, although not precedential, states

the following with regard to TRA § 1012(c)(3)(C):

we note that section 1012(c)(3)(C) of the 1986 Act provides that any reserve weakening (that is, a decrease) after August 16, 1986, by an existing Blue Cross or Blue Shield organization, shall be deemed to have occurred in the first taxable year beginning after December 31, 1986. Thus, under the provisions of section 1012(c)(3)(C), a decrease to reserves occurring

This court, therefore, concludes that, in the context of TRA § 1012(c)(3)(C), "reserve weakening" is defined as a decrease in reserves. The Supreme Court's decision in *Atlantic Mutual Insurance Company v. Commissioner of Internal Revenue*, the words of § 1.846–3, and logic dictate that reserve weakening is defined as any net reductions in loss reserves.

Given the definition of reserve weakening as any net reductions in reserves, the next question to be addressed is, whether reserve weakening actually occurred in this case, so as to require resort to TRA § 1012(c)(3)(C) in the first place. The defendant contends that BCW's unpaid loss reserve was "strengthened," not weakened, in the amount of $2,833,129.00 by the end of 1986. Indeed, the "Addendum to the Report of the Examination of Blue Cross & Blue Shield United of Wisconsin, Milwaukee, Wisconsin, As of June 30, 1986, by Office of the Commissioner of Insurance, State of Wisconsin," supports defendant's position. The Addendum is entitled: "Statement Of Assets, Liabilities, Reserves and Unasigned [sic] Funds per the December 31, 1986 Annual Statement." The first entry under "Liabilities" is "Claims unpaid," which refers to the loss reserve for incurred-but-not-paid claims. According to the statement, the claims unpaid as of December 31, 1985 was $75,588,265.00, while the claims unpaid as of December 31, 1986 was $78,421,394.00. The claims unpaid figure for 1986 was larger than that for 1985; BCW reported "reserve strengthening," as opposed to reserve weakening, in the amount of $2,833,129.00 at the end of 1986.[19]

The plaintiff states that: "[d]efendant's computation of the amount of 'reserve strengthening' requires interpretation and application of Treasury Regulation § 1.846–3

and it appears that Defendant may have performed the computation incorrectly." In response, the defendant asserts that "[p]laintiff does not substantiate its objection to the correctness of the computation." The "computation" that plaintiff is apparently challenging involved nothing more than elementary-level subtraction. As indicated, the numbers cited by the defendant were taken from the plaintiff's 1986 Annual Statement, and are directly cited in the Addendum to the Report conducted by the OCI in Wisconsin. The plaintiff has not argued that the figures cited on this Addendum, which purport to represent the loss reserves for unpaid claims for the end of tax years 1985 and 1986, are incorrect. In short, the plaintiff has not offered evidence to dispute the fact that reserve strengthening occurred in this case.

In further support of its argument that reserve strengthening occurred in tax year 1986, defendant cites a statement plaintiff attached to its original 1987 return. According to the defendant, in this statement, the plaintiff acknowledged that it had reserve strengthening in 1986. In the "Statement Attached To and Made Part of" its original 1987 return, filed in September, 1988, Blue Cross Wisconsin stated in part:

> During calendar year 1986, the Taxpayer and certain of its subsidiaries had additions to reserves attributable to an increase in estimates of reserves established for prior accident years as well as an increase in the estimate for the 1986 accident year. These increases were necessary and customary in its determination of unpaid loss reserves.

> The Taxpayer believes these additions to the reserves are reasonable additions representing actual unpaid losses which do not

after August 16, 1986 results in additional taxable income for the first taxable year beginning after December 31, 1986.
Priv. Rul. 9330002 (Tech.Adv.Mem.) (Apr. 13, 1993).

19. The unpaid loss reserve technically includes the "claims unpaid" and the "unpaid claim adjustment expenses," as reported on the annual statement. Therefore, it would be more accurate to add the unpaid claim adjustment expenses for both 1985 to 1986 to the respective claims unpaid amounts for those years. The amount of

unpaid claim adjustment expenses for 1985 was $6,400,000.00, which, when added to $75,588,265.00, results in an unpaid loss reserve of $ 81,988,265.00 for 1985. In 1986, the amount of unpaid claim adjustment expenses was $7,600,000.00, which, when added to the claims unpaid for 1986 of $78,421,394.00, yields $86,021,394. Even with this comprehensive calculation, the unpaid loss reserve for 1986 is greater than that for 1985, resulting in reserve strengthening in 1986.

constitute "reserve strengthening" under the [TRA], even though these additions might otherwise constitute reserve strengthening as it was defined in Internal Revenue Service Advance Notice 88–100. [20]

Accordingly, the Taxpayer has not taken into account, in determining taxable income, the difference between the undiscounted and the discounted unpaid losses at the end of 1986.

This statement demonstrates that the plaintiff had full knowledge of the interpretation of "reserve strengthening" in IRS Notice 88–100, which gave advanced notice as to § 1.846's content. As the defendant argues:

While it correctly interpreted the law and Notice 88–100 as requiring a § 481 income adjustment in 1987 with respect to the difference between the 12/31/86 discounted and undiscounted unpaid loss reserves attributable to amounts of "reserve strengthening," Blue Cross chose to "interpret" the law and the Notice as not requiring it to make that income adjustment.

In other words, according to the defendant, the plaintiff's position in its statement appears to be that its interpretation of reserve strengthening was correct, while the IRS' interpretation, as delineated in I.R.S. Notice 88–10, 1988 WL 561126, was incorrect. Thus, the defendant maintains that the "plaintiff's legal interpretation of its factual increase in its 1986 reserves was wrong." In response, plaintiff merely argues that the treatment of plaintiff's loss reserves on its initial 1987 return is not at issue in this case; rather, the issue in dispute is the plaintiff's treatment of its loss reserve as of December 31, 1986 on its amended return.

The defendant's argument is persuasive. The plain language of the plaintiff's "Statement Attached to and Made Part of" its original 1987 return indicates that the plaintiff conceded that it had "reserve strengthening" under the Notice, and by implication, under § 1.846, in 1986. As already noted, the Supreme Court offered a binding definition of reserve strengthening in § 1.846. In addition, the plaintiff has failed to rebut the evidence in the record indicating that "reserve strengthening" did, in fact, occur in 1986. Given the conclusion that there was reserve strengthening in 1986, not reserve weakening, the plaintiff can no longer invoke the reserve weakening provision, TRA § 1012(c)(3)(C). Under the plaintiff's argument, if TRA § 1012(c)(3)(C) cannot be invoked, the Blue Book and the Colloquy, which refer to actual claims paid data, also cannot be invoked, since, according to the plaintiff, they were offered to interpret TRA § 1012(c)(3)(C).

Against this attempt by plaintiff to implicate actual claims paid data, IRC §§ 832 and 846 explicitly require the plaintiff to use the actuarial estimate of its unpaid loss reserve as of December 31, 1986, as reported on the plaintiff's annual statement. In response to the plaintiff's argument that the "general reserving rules of §§ 832 and 846" do not apply to the "newly taxed" Blue Cross organizations, it should be noted, as plaintiff acknowledges in its argument regarding the Closing Agreement, that IRC § 833, the provision specifically applicable to Blue Cross organizations, states that Blue Cross and

**20.** I.R.S. Notice 88–100, 1988–2 C.B. 439, gave advanced notice to taxpayers that § 1.846 would define "reserve strengthening (weakening)" as all increases (decreases) to reserves (with some minor exceptions not relevant here), without taking into consideration whether the increase (or decrease) was reasonable:

For purposes of fresh start [section 1023(e)(3)(B) of the 1986 Act], the regulations will provide that reserve strengthening (weakening) includes the following three categories: (1) all additions to (subtractions from) unpaid losses attributable to an increase (decrease) in an estimate of the amount of a reserve for unpaid losses established for an accident year prior to 1986 (taking into account claims paid, and loss adjustment expenses paid by property and casualty companies, with respect to that accident year); (2) all additions to (subtractions from) reserves resulting from a change in the assumptions used in estimating losses for any accident year (other than changes in assumed interest rates applicable to reserves for the 1986 accident year); and (3) all unspecified or unallocated additions to (subtractions from) loss reserves.... These additions (subtractions) shall be treated as reserve strengthening (weakening) regardless of the reasonableness of, or the taxpayer's discretion in establishing, the reserve amount.

I.R.S. Notice 88–100, 1988–2 C.B. 439.

Blue Shield organizations "shall be taxable under this part in the same manner as if it were a stock insurance company." IRC § 833(a)(1). Therefore, the "general reserving rules of §§ 832 and 846," can be applied to the "newly taxed" Blue Cross organizations pursuant to IRC § 833(a)(1). Contrary to plaintiff's argument, the applicable statutes do not permit plaintiff to employ actual claims paid data for 1987 to compute its loss reserve for unpaid claims as of December 31, 1986.

### The Closing Agreement

The plaintiff also argues that, even in the absence of statutory support for its contention, the Closing Agreement executed between the parties provides for the use of actual claims paid data. The defendant disagrees. Closing agreements are governed by IRC § 7121, which authorizes the IRS to enter into agreements in writing with taxpayers to determine their total tax liability for "any internal revenue tax for any taxable period." 26 C.F.R. § 301.7121–1 (1993). The statute also states that, if the agreement is approved by the authorized individual, "such agreement shall be final and conclusive, and, except upon a showing of fraud or malfeasance, or misrepresentation of a material fact-(1) the case shall not be reopened as to the matters agreed upon or the agreement modified by any officer, employee, or agent of the United States[.]" 26 U.S.C. § 7121(b) (1988); *In re Spendthrift Farm, Inc.*, 931 F.2d 405, 407 (6th Cir.1991) ("[C]losing agreements are binding on the parties as to the matters agreed upon and may not be modified or disregarded in any proceeding unless there is a showing of fraud, malfeasance, or misrepresentation of a material fact.").

■ Closing agreements are interpreted under ordinary contract principles, and, thus, can be viewed as binding contracts between the taxpayer and the IRS:

Closing agreements are authorized, and limited by, the language of the statute. To the extent that the statute conflicts with general and otherwise governing contract law principles, the statute governs. But closing agreements are contracts nonetheless, and courts have repeatedly stated

that, in analyzing closing agreements, the court must use ordinary contract principles.

*Marathon Oil Co. v. the United States*, 42 Fed.Cl. 267, 274 (1998), *aff'd per curiam*, 215 F.3d 1343 (Fed.Cir.1999) (citing *United States v. Lane*, 303 F.2d 1, 4 (5th Cir.1962)); *Rink v. Comm'r*, 47 F.3d 168, 171 (6th Cir. 1995); *In re Spendthrift Farm, Inc.*, 931 F.2d at 407; *Smith v. United States*, 850 F.2d 242, 245 (5th Cir.1988). Otherwise stated, IRC § 7121 closing agreements "certainly are contracts in the ordinary legal sense of the term, because they contain binding promises. The government does not claim to be free to walk away from a closing agreement, and it certainly does not acknowledge the right of a taxpayer to do so." *United States v. Nat'l Steel Corp.*, 75 F.3d 1146, 1150 (7th Cir.1996) (Posner, J.).

■ In the case before this court, a Closing Agreement was executed by the parties in 1993. The Closing Agreement addressed the federal income tax status of BCW for tax years 1985 and 1986. The agreement states that BCW would be treated as a tax-exempt entity prior to 1987, and that it would gain NOL from pre–1987 tax periods in the amount of twenty-five million dollars, which could be carried over to 1987 and later years. The disputed provision of the Closing Agreement is subparagraph 3(e), which states:

(3) As of January 1, 1987, the taxpayer was an "Existing Blue Cross or Blue Shield organization" as this term is defined in subparagraph (c)(2) of section 833, Subtitle A, IRC. As such, the following attributes apply to the taxpayer as of that date:...

(e) the taxpayer's January 1, 1987 loss reserve for incurred-but-not-paid claims will be determined in accordance with actual claims paid data for 1987[.]

According to the plaintiff, paragraph (3) outlines the parties' agreement as to how certain Blue Cross or Blue Shield "attributes" would be applied to the plaintiff. One such "attribute," the plaintiff claims, is the manner in which a Blue Cross or Blue Shield organization is to compute its opening 1987 loss reserve. In the plaintiff's view, subpara-

graph 3(e) relates to the losses incurred deduction under IRC § 832(c)(4). Plaintiff concludes that the Closing Agreement authorizes the calculation of its opening 1987 reserve for incurred-but-not-paid claims in accordance with its actual claims paid data for 1987 for the purpose of its losses incurred deduction.

The defendant argues that paragraph (3) of the Closing Agreement "purported to be, and is properly read as, nothing more than a neutral statement of the 'special rules' applicable to 'Existing Blue Cross and Blue Shield Organizations' under TRA § 1012 and Code § 833." As such, subparagraph 3(e) of the Closing Agreement is irrelevant to BCW's IRC § 832(c)(4) deduction for tax year 1987. The defendant maintains that subparagraph 3(e) relates, instead, to the special deduction accorded Blue Cross and Blue Shield organizations under IRC § 833(b).[21] In addition, relying on extrinsic evidence, the defendant argues that the IRS did not agree to any matter pertaining to BCW's IRC § 832(c)(4) deduction for tax year 1987 in the Closing Agreement. Therefore, the defendant asserts that the Closing Agreement does not permit BCW to utilize actual claims paid data to compute its deduction.

The United States Court of Appeals for the Federal Circuit stated in *Jowett, Inc. v. United States* that:

> In interpreting a contract, we begin with the plain language. We give the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning. In addition, we must interpret the contract in a manner that gives meaning to all of its provisions and makes sense.

*Jowett, Inc. v. United States*, 234 F.3d 1365, 1368 (Fed.Cir.2000) (citations omitted); *see also Hunt Constr. Group, Inc. v. United States*, 281 F.3d 1369, 1372 (2002) ("We begin with the plain language when interpreting a contract.... The contract must be considered as a whole and interpreted to effectuate its spirit and purpose, giving reasonable meaning to all parts.") (citations omitted); *Giove v. Dep't of Transp.*, 230 F.3d 1333, 1340–41 (Fed.Cir.2000) ("In addition, we must interpret the contract in a manner that gives meaning to all of its provisions and makes sense. Further, business contracts must be construed with business sense, as they naturally would be understood by intelligent men of affairs.") (citations omitted).

When the terms of a contract are clear and unambiguous, there is no need to resort to

---

21. IRC § 833, "Treatment of Blue Cross and Blue Shield organizations, etc.," reads in pertinent part:

(a) **General rule**
In the case of any organization to which this section applies–
(1) **Treated as stock company**
Such organization shall be taxable under this part in the same manner as if it were a stock insurance company.
(2) **Special deduction allowed**
The deduction determined under subsection (b) for any taxable year shall be allowed....
(b) **Amount of deduction**
(1) **In general**
Except as provided in paragraph (2), the deduction determined under this subsection for any taxable year is the excess (if any) of–
(A) 25 percent of the sum of–
(i) the claims incurred during the taxable year, and
(ii) the expenses incurred during the taxable year in connection with the administration, adjustment, or settlement of claims, over
(B) the adjusted surplus as of the beginning of the taxable year.
(2) **Limitation**

The deduction determined under paragraph (1) for any taxable year shall not exceed taxable income for such taxable year (determined without regard to such deduction).
(3) **Adjusted surplus**
For purposes of this subsection–
(A) **In general**
The adjusted surplus as of the beginning of any taxable year is an amount equal to the adjusted surplus as of the beginning of the preceding taxable year–
(i) increased by the amount of any adjusted taxable income for such preceding taxable year, or
(ii) decreased by the amount of any adjusted net operating loss for such preceding taxable year.
(B) **SPECIAL RULE**
The adjusted surplus as of the beginning of the organization's 1st taxable year beginning after December 31, 1986, shall be its surplus as of such time. For purposes of the preceding sentence and subsection (c)(3)(C), the term "surplus" means the excess of the total assets over total liabilities as shown on the annual statement....
IRC § 833(a)-(b).

extraneous circumstances for its interpretation. *See Sea–Land Serv., Inc. v. United States,* 213 Ct.Cl. 555, 567, 553 F.2d 651, 658 (1977), *cert. denied,* 434 U.S. 1012, 98 S.Ct. 724, 54 L.Ed.2d 755 (1978). Construction of an unambiguous writing, therefore, is an appropriate matter for summary judgment. *See Martin v. United States,* 20 Cl.Ct. 738, 745 (1990); *Kelley v. United States,* 19 Cl.Ct. 155, 161 (1989). A written agreement is ambiguous when a plain reading of the contract could result in more than one reasonable interpretation. *See also Metric Constructors, Inc. v. NASA,* 169 F.3d 747, 751 (Fed.Cir.1999); *Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 997 (Fed.Cir.1996); *A–Transport Northwest Co., Inc. v. United States,* 36 F.3d 1576, 1584 (Fed.Cir.1994) ("A contract is ambiguous only when it is susceptible to two reasonable interpretations."); *Tacoma Dept. of Pub. Utils. v. United States,* 31 F.3d 1130, 1134 (Fed.Cir.1994) (citing *Hills Materials Co. v. Rice,* 982 F.2d 514, 516 (Fed.Cir.1992)). It is not enough that the parties differ in their interpretation of the contract clause. *See Cmty. Heating & Plumbing Co. v. Kelso,* 987 F.2d 1575, 1578 (Fed.Cir.1993). Nor may a court look to extrinsic evidence in determining whether a contract is ambiguous. *See McAbee Constr., Inc. v. United States,* 97 F.3d 1431, 1435 (Fed.Cir.1996); *Tacoma Dep't of Pub. Utils. v. United States,* 31 F.3d at 1134 ("Outside evidence may not be brought in to create an ambiguity where the language is clear."); *Interwest Constr. v. Brown,* 29 F.3d 611, 615 (Fed.Cir.1994) ("Extrinsic evidence ... should not be used to introduce an ambiguity where none exists."). However, because an ambiguous or uncertain writing sometimes can only be understood upon consideration of the surrounding circumstances, extrinsic evidence will be allowed to interpret an ambiguous clause. *See Sylvania Elec. Prods., Inc. v. United States,* 198 Ct.Cl. 106, 126, 458 F.2d 994, 1005 (1972).

An examination of the language of the Closing Agreement must occur first. The plain language of the agreement supports the defendant's interpretation of the contract. Paragraph (3) is a recitation of the provisions under IRC § 833, which is applicable to "Existing Blue Cross or Blue Shield Organizations."

The introductory language in paragraph (3) of the Closing Agreement states that the parties agree that BCW qualifies as a "Blue Cross or Blue Shield organization" within the meaning of IRC § 833, as of January 1, 1987. Paragraph (3) reads: "As of January 1, 1987, the taxpayer was an 'Existing Blue Cross or Blue Shield organization' as this term is defined in subparagraph (c)(2) of section 833, Subtitle A, IRC. As such, the following attributes apply to the taxpayer as of that date[.]" After identifying the plaintiff as an "Existing Blue Cross or Blue Shield organization" under IRC § 833, the introductory language states, "[a]s such;" this language can only be interpreted to mean that, as an entity qualifying under IRC § 833, the plaintiff has the following attributes. Furthermore, one of the "attributes" applied to entities qualifying under IRC § 833 is the special deduction under IRC § 833, which is unique to "Existing Blue Cross or Blue Shield Organizations." In contrast, the IRC § 832(c)(4) deduction applies to all P & C insurance companies, not just Blue Cross or Blue Shield organizations; thus, the IRC § 832(c)(4) deduction would not logically be included in a recitation of the "attributes" of Blue Cross or Blue Shield Organizations. In short, the introductory language of paragraph (3) leads to the conclusion that subparagraph 3(e) is referring to IRC § 833, not IRC § 832(c)(4).

The interpretation that subparagraph (3)(e) of the Closing Agreement relates solely to IRC § 833 is corroborated by the fact that all of the other subparagraphs of paragraph (3) refer to IRC § 833 or to TRA § 1012, which enacted IRC § 833. Subparagraph 3(a) states that, "if otherwise in compliance with the terms of THE TREG [Treasury Department Regulation § 1.1502–75], the taxpayer may participate in the filing of the 'new group election' cited in subparagraph (d)(5)(v) of THE TREG[.]" Although subparagraph 3(a) does not explicitly refer to IRC § 833, nor to TRA § 1012, it is, in fact, related to IRC § 833 because, as the introductory "WHEREAS" language of the Closing Agreement indicates, "subpara-

graph(d)(5)(v) of THE TREG" is a reference to Treasury Department Regulation § 1.1502–75(d)(5)(v) of the Consolidated Returns Regulations, which is entitled "Coordination with section 833." 26 C.F.R. § 1.1502–75(d)(5)(v) (1993). The fact that subparagraph 3(a) is referencing § 1.1502–75(d)(5)(v) is clear because they both refer to "new group election." Section 1.1502–75(d)(5)(v) states:

§ 1.1502–75 Filing of consolidated returns...

(d) When group remains in existence—...

(5) Coordination with section 833—...

(v) Election to file as a new group. If, solely by reason of the enactment of section 833, a section 833 organization became the new common parent of an old group on January 1, 1987, the application of the five-year prohibition on reconsolidation in section 1504(a)(3)(A) to the old group is waived and the old group together with the new section 833 organization common parent may elect to file as a new group provided that all includible corporations elect to file a consolidated (or amended consolidated) return as a new group for the first taxable year beginning after December 31, 1986. To revoke this election, see paragraph (d)(5)(x) of this section.

§ 1.1502–75(d)(5)(v).

Subparagraph 3(b) specifically refers to section 833: "the taxpayer's taxable income will be computed pursuant to the provisions of section 833, Subtitle A, IRC, and the 'special rules for Existing Blue Cross or Blue Shield organizations' stated in section 1012(c)(3) of THE TRA[.]"

Subparagraph 3(c) states that "the taxpayer's taxable income will be computed without the reduction in 'unearned premium reserves' otherwise required by section 832, Subtitle A, IRC [.]" While 3(c) mentions IRC § 832, it is actually referring to the IRC § 833(a)(3) [22]

exemption from the reduction in "unearned premium reserves," which would otherwise be required by IRC § 832(b)(4)(B) and is applicable to all insurers taxable under IRC §§ 831–835. As the defendant maintains, the reference to IRC § 832 in paragraph 3(c) does not refer to any special rule contained in IRC § 832, but rather, refers to the "special rule" contained in IRC § 833(a). Without this special rule, Blue Cross and Blue Shield organizations would have been required to comply with IRC § 832(b)(4)(B).

Subparagraph 3(d) states that "the taxpayer is not—solely because of its becoming, on January 1, 1987, an 'Existing Blue Cross or Blue Shield organization' as this term is defined in subparagraph (c)(2) of section 833, Subtitle A, IRC—subject to the adjustments set forth in section 481, Subtitle A, IRC[.]" Subparagraph 3(d) refers to TRA § 1012(c)(3)(A)(i), which provides that, for their first taxable year, Blue Cross or Blue Shield organizations will not be subject to an income adjustment under IRC § 481 or any other Code provision, which would otherwise be required for a change in their method of accounting.[23]

Subparagraph 3(f) states that: "for the purposes of section 1011, Subtitle A, IRC, the adjusted bases of all the taxpayer's assets shall be the respective fair market value of the individual assets as of January 1, 1987." While subparagraph 3(f) does not explicitly refer to IRC § 833, or TRA § 1012, subparagraph 3(f) actually concerns TRA § 1012. Section 1011 of the IRC, which is referenced in subparagraph 3(f), provides the general rule for calculating the "adjusted basis for determining gain or loss:"

§ 1011. Adjusted basis for determining gain or loss

(a) General rule

The adjusted basis for determining the gain or loss from the sale or other disposi-

---

**22.** IRC § 833(a)(3) states that "[s]ubparagraph (B) of paragraph (4) of section 832(b) shall be applied by substituting '100 percent' for '80 percent', and subparagraph (C) of such paragraph (4) shall not apply."

**23.** TRA § 1012(c)(3)(A)(i) states:
    (A) IN GENERAL.–In the case of any existing Blue Cross or Blue Shield organization (as

defined in section 833(c)(2) of the Internal Revenue Code of 1986 as added by this section)–
    (i) no adjustment shall be made under section 481 (or any other provision) of such Code on account of a change in its method of accounting for its 1st taxable year beginning after December 31, 1986[.]

tion of property, whenever acquired, shall be the basis (determined under section 1012 or other applicable sections of this subchapter and subchapters C (relating to corporate distributions and adjustments), K (relating to partners and partnerships), and P (relating to capital gains and losses)), adjusted as provided in section 1016. IRC § 1011(a). As the defendant argues, subparagraph 3(f) concerns TRA § 1012(c)(3)(A)(ii), which states:

> (A) IN GENERAL.—In the case of any existing Blue Cross or Blue Shield organization (as defined in section 833(c)(2) of the Internal Revenue Code of 1986 as added by this section)-...
>
> (ii) for purposes of determining gain or loss, the adjusted basis of any asset held on the 1st day of such taxable year shall be treated as equal to its fair market value as of such day.

TRA § 1012(c)(3)(A)(ii).

The plaintiff notes that, subparagraph 3(f) and TRA § 1012(c)(3)(A)(ii) differ in one respect: the language in the Closing Agreement refers to IRC § 1011, while TRA § 1012(c)(3)(A)(ii) states "for purposes of determining gain or loss." However, this distinction is of no consequence since subparagraph 3(f)'s language, "for the purposes of section 1011," and the language in TRA § 1012(c)(3)(A)(ii), "for purposes of determining gain or loss," are virtually synonymous. Therefore, the court finds that subparagraph 3(f) does concern TRA § 1012(c)(3)(A)(ii).

The plaintiff argues that the difference in language cited above is "significant" because "it is apparent that ¶ 3(f) was intended by the parties to clarify or alter certain aspects of the statute [TRA § 1012(c)(3)(A)(ii) ] (in precisely the same manner as ¶ 3(e))." In response to plaintiff's argument, however, the court notes, again, that a comparison of the language in subparagraph 3(f) of the Closing Agreement, IRC § 1011, and TRA § 1012(c)(3)(A)(ii) indicates that subparagraph 3(f) is virtually synonymous with TRA § 1012(c)(3)(A)(ii). Moreover, even assum-

ing, for the sake of argument, that plaintiff is correct that "¶ 3(f) was intended ... to clarify or alter" TRA § 1012(c)(3)(A)(ii), it does not do so "in precisely the same manner as ¶ 3(e)," as plaintiff contends. Subparagraph 3(f) clearly states in the beginning: "for the purposes of section 1011 ...[;]" it is clear on the face of subparagraph 3(f) that it relates to IRC § 1011. In contrast, subparagraph 3(e) does not refer to any statute.

Since subparagraph 3(e) of the Closing Agreement does not refer to any statute, the only reasonable interpretation of subparagraph 3(e) is that it concerns IRC § 833 because (1) it falls under the introductory language of paragraph (3), which explicitly refers to IRC § 833, and appears to introduce the attributes of Blue Cross and Blue Shield organizations under IRC § 833; and (2) all the other subparagraphs of paragraph (3) refer to IRC § 833, or TRA § 1012. This finding does not place an improper "limiting condition" on subparagraph (3)(e), as the plaintiff asserts; rather, it merely accords the paragraph its logical interpretation, given the plain language of the agreement.

Finally, as the defendant notes, the IRC § 832(c)(4) deduction, in particular, is not mentioned in the Closing Agreement, and the language in the agreement does not indicate in any way that paragraph 3(e) was intended to apply to the IRC § 832(c)(4) deduction.[24] The plaintiff, however, contends that IRC § 832 is mentioned in the beginning of the Closing Agreement. The Closing Agreement language to which plaintiff refers reads:

> WHEREAS, the parties wish to determine certain matters relative to the applicability to the taxpayer of sections 56, 172, 481, 501, 831, 832, 833, and 1011 of Subtitle A, IRC: Chapter 68, Subtitle F, IRC; Treasury Regulation 1.1502–75 (hereinafter referred to as "THE TREG"); and section 1012 of The Tax Reform Act of 1986 (hereinafter referred to as "THE TRA").

The plaintiff's argument that IRC § 832 appears in the "WHEREAS" language at the

---

24. The defendant also argues that paragraph (3)(e) of the Closing Agreement does not state that the January 1, 1987 opening reserve will be *equal* to the amount of actual claims paid in

1987. While the defendant is technically correct, this meaning can logically be implied from the words "in accordance with."

beginning of the agreement is not persuasive, because that language is of such a general nature that it would defy logic to link subparagraph 3(e) to the mere mention of IRC § 832 in the introductory language. Moreover, IRC § 832 is just one of a number of statutes, including IRC § 833, referred to in the introductory language. In stark contrast, the introductory language of paragraph (3) specifically refers to IRC § 833, not IRC § 832. Despite plaintiff's attempt to forge a link between IRC § 832 and subparagraph 3(e), the plain language of the Closing Agreement is not consistent with plaintiff's interpretation.

Plaintiff also claims that, even if subparagraph 3(e) can be read as being limited in its application to IRC § 833, section 833(a) provides that Blue Cross and Blue Shield Organizations "shall be taxable under this part as if it were a stock insurance company." Because the IRC § 832 losses incurred deduction does, in fact, apply to stock insurance companies, the plaintiff tries to argue that subparagraph 3(e) refers to the IRC § 832 losses incurred deduction, but it does so via IRC § 833(a).

The plaintiff is correct that IRC § 833(a)(1) requires that IRC § 832 be applied to Blue Cross and Blue Shield organizations. However, as discussed in the previous section of this opinion, IRC §§ 832(b)(5) and 846 also state that the actuarial estimate in the annual statement should be used to calculate the unpaid loss reserve. The plaintiff has not demonstrated that the language of subparagraph 3(e) serves to override the statutory requirements contained in IRC §§ 832(b)(5) and 846. If subparagraph 3(e) of the Closing Agreement was intended to apply to the IRC § 832(c)(4) deduction, subparagraph 3(e) should have so stated clearly.

Regarding closing agreements, the United States Court of Appeals for the Sixth Circuit wrote:

> Therefore, while that [sic] is no "magic words" requirement, for the closing agreement to cut off the IRS' claim for restricted interest, there must be a specific waiver in the closing agreement. In this case, there is no such waiver. The closing agreement between Spendthrift and the IRS does not mention interest or penalties.
>
> Because the plain language of the closing agreement is unambiguous, we find that the district court properly held that the IRS did not waive its statutory right to restricted interest. . . .

*In re Spendthrift Farm, Inc.*, 931 F.2d at 407; *see also Smith v. United States*, 850 F.2d at 245 (holding that a closing agreement did not preclude the IRS' claim for interest and penalties because the agreement did not refer to interest and penalties). In *Zaentz v. Commissioner*, the United States Tax Court found that parties are "bound only as to the matters agreed upon" in the closing agreement. *Zaentz v. Comm'r*, 90 T.C. 753, 761, 1988 WL 34876 (1988).

In the present case, the method for calculating the losses incurred deduction is explicitly provided for by statute under IRC § 832(b)(5). In order for the plaintiff to employ actual claims paid data to calculate this deduction, in lieu of the annual statement figure as required by statute, the Closing Agreement must have explicitly so stated. In this respect, the analysis in *Marathon Oil Co. v. United States* is relevant:

> Indeed, given the writing requirement of the statute [IRC § 7121], it appears to the court that closing agreements would have to be fully integrated agreements, because the parties cannot add, subtract, or modify terms outside the agreements themselves. Of course, the court may invoke traditional contract principles to interpret the terms of the closing agreements, for instance in resolving ambiguous or conflicting terms in a closing agreement; the court cannot, however, fundamentally alter the agreement as written, which is what plaintiff's interpretation would have the court do.

*Marathon Oil Co. v. United States*, 42 Fed. Cl. 267, 275 (1998). BCW's interpretation of the Closing Agreement, that subparagraph (3)(e) refers to the IRC § 832(c)(4), would require this court to "fundamentally alter the agreement as written." *Id.*

This court finds that the Closing Agreement is clear and unambiguous. The only reasonable interpretation of the plain language of subparagraph 3(e) of the Closing

Agreement is that it refers to the special deduction under IRC § 833, not the IRC § 832 losses incurred deduction.

## CONCLUSION

IRC §§ 832 and 846 require that the actuarial estimate of BCW's unpaid loss reserve as of December 31, 1986, as reported on its annual statement, be employed to calculate BCW's IRC § 832(c)(4) deduction for tax year 1987. The Closing Agreement between the parties does not provide otherwise. Therefore, plaintiff's motion for partial summary judgment is **DENIED** and defendant's motion for partial summary judgment is **GRANTED**.

**IT IS SO ORDERED.**